## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## BALTIMORE DIVISION

|  |  |
|---|---|
| JANIS MCNEAL, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| *Plaintiff*, | ) ) Case No. |
| v. | ) ) ) **CLASS ACTION COMPLAINT** ) |
| KNORR-BREMSE AG; KNORR BRAKE COMPANY LLC; NEW YORK AIR BRAKE LLC; BENDIX COMMERCIAL VEHICLE SYSTEMS LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; FAIVELEY TRANSPORT NORTH AMERICA INC.; RAILROAD CONTROLS L.P.; RICHARD BOWIE; and DOES 1-20, | ) ) Jury Trial Demanded ) ) ) ) ) ) |
| *Defendants*, | ) ) ) ) ) ) ) |

**TABLE OF CONTENTS**

**Page**

I.  NATURE OF THE ACTION ................................................................................ 1

II.  JURISDICTION AND VENUE ........................................................................ 5

III.  THE PARTIES ................................................................................................ 5

IV.  THE RAILWAY INDUSTRY LABOR MARKET ......................................... 7

V.  DEFENDANTS' NO-POACH CONSPIRACY .............................................. 10

VI.  MULTIPLE FORMER EMPLOYEES AND THIRD-PARTY RECRUITERS INDEPENDENTLY CORROBORATE DEFENDANTS' CONSPIRACY ................... 14

VII.  DOJ INVESTIGATES DEFENDANTS' AGREEMENTS TO REFRAIN FROM SOLICITING EACH OTHER'S EMPLOYEES ............................................. 16

    A.  DOJ Issues Guidance in 2016 Relating to Employer No-Poach Agreements ...... 16

    B.  DOJ Settles Claims with Defendants in 2018 for Misconduct Revolving around their No-Poach Agreements ................................................. 18

VIII.  ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY .................... 19

IX.  FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS .................................................................................... 20

X.  CLASS ALLEGATIONS ............................................................................... 21

XI.  CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1 .................................................. 23

XII.  PRAYER FOR RELIEF ................................................................................ 23

XIII.  JURY DEMAND ........................................................................................... 24

Plaintiff Janis McNeal ("Plaintiff") brings this class action, on behalf of herself and all others similarly situated, for claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages for injuries caused by Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake Company, Bendix Commercial Vehicle Systems LLC, Westinghouse Air Brake Technologies Corporation, Faiveley Transport North America Inc., and Railroad Controls L.P..  The allegations herein are based upon Plaintiff's personal knowledge with respect to her own circumstances and based upon information and belief or the extensive investigation of her counsel as to all other allegations.  This investigation, which is ongoing, includes interviews of former employees of Defendants and of third-party recruiters retained by Defendants with direct knowledge of the matters alleged herein.  These confidential witnesses ("CWs") are identified herein by number, e.g., CW1, CW2, etc.[1]  On behalf of herself and the Class she seeks to represent (as defined below), Plaintiff alleges the following:

## I.   NATURE OF THE ACTION

1.      This antitrust class action challenges, under Section 1 of the Sherman Act, 15 U.S.C. § 1, a series of unlawful agreements between three of the world's largest rail equipment suppliers to restrain competition in the labor markets in which they compete for employees.

2.      Defendant Knorr-Bremse AG ("Knorr") and its wholly-owned subsidiaries Knorr Brake Company LLC ("Knorr Brake") and New York Air Brake Company ("NY Air Brake") (collectively, "Knorr") and Westinghouse Air Brake Technologies Corporation ("Westinghouse"), Faiveley Transport North America, Inc. ("Faiveley North America") and Railroad Controls, L.P. ("Railroad Controls") (collectively, "Wabtec") are each other's top competitors for rail equipment used in freight and passenger rail applications.  They also

---

[1] With respect to CWs, generic feminine pronouns are used throughout regardless of gender identity and in an effort to protect their identities.

compete with each other to attract, hire, and retain employees, including laborers and various skilled employees such as rail industry project managers, engineers, sales executives, business unit heads, and corporate officers.  Prior to its November 30, 2016 acquisition by Westinghouse, Faiveley North America and its parent, Faiveley Transport S.A. ("Faiveley") also competed with Knorr and Wabtec to attract, hire, and retain employees.

3.     Rather than compete to attract the best employees by offering higher salaries and attractive benefits, Defendants conspired to thwart competition for employees and suppress wages and employment opportunities.  Indeed, the unlawful agreements between Knorr, Wabtec, and Faiveley included promises and commitments not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, the "no-poach agreements").  As set forth below, several former employees of the Defendants confirm the illicit agreements.  In fact, one former Knorr Brake Human Resources Director states that she was explicitly instructed by Defendant and Knorr Brake President, Richard Bowie, to refrain from recruiting employees from Wabtec or Faiveley because the companies had an agreement not to recruit each other's employees.

4.     Beginning no later than 2009, senior executives at Knorr and Wabtec, including Bowie and other executives at several of their respective U.S. subsidiaries, entered into no-poach agreements with one another.  Beginning no later than 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into a no-poach agreement with one another.  And beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley North America entered into a no-poach agreement with one another.

5.     The no-poach agreements spanned several years and extended to skilled and non-skilled employees alike.  They were monitored and enforced by high-level company executives

and were not reasonably necessary to any separate, legitimate business transaction, or collaboration between the companies.  The no-poach agreements had the effect of unlawfully allocating employees between the companies, resulting in harm to U.S. workers and consumers.

6.      By entering into no-poach agreements, Knorr, Wabtec, and Faiveley substantially reduced competition for employees to the detriment of workers in this important U.S. industry. These no-poach agreements denied American rail industry workers "access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."  Moreover, these no-poach agreements disrupted the efficient allocation of labor that comes from Knorr, Wabtec, and Faiveley competing for rail industry employees.

7.      In connection with a review of Westinghouse's November 2016 acquisition of Faiveley, the Antitrust Division of the United States Department of Justice ("DOJ") uncovered Defendants' no-poach agreements.

8.      After conducting a lengthy investigation, on April 3, 2018, Defendants Knorr and Wabtec announced their agreement to settle the DOJ's charges.  Critically, the DOJ found that Defendants' no-poach agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry" and, therefore, constituted *per se* violations of the Sherman Act.  The DOJ further stated that "[t]hese agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

9.      Plaintiff's counsel has conducted an independent investigation into the illicit no-poach agreements which has included, among other things, interviews with numerous former

employees of and third-party recruiters retained by Defendants.  This extensive (and ongoing) investigation has corroborated the conduct identified and charged by the DOJ and obtained independent direct evidence of the conspiracy which Plaintiff believes targeted not just the skilled employee positions identified by the DOJ but all employees of the Defendants.

10.     For example, CW1, a Director of Human Resources at Knorr Brake during the Class Period,[2] recalls that every Monday, Bowie hosted a staff meeting in the Knorr Brake board room.  During one staff meeting in late 2014, CW1 briefed those in attendance about open senior positions at the company.  At least two other Directors attending this meeting recommended CW1 seek out certain Faiveley employees as prospective candidates.  CW1 was instructed by Bowie not to recruit from Faiveley or Wabtec because of the no-poach agreements.

11.     CW2, a Director and a lead engineer for Knorr Brake during the Class Period confirms that although she believes it was not formally documented, there were no-poach agreements between Knorr, Wabtec and Faiveley.  She was told as much by Defendant Bowie. CW2 recalls that there were instances during the Class Period when she discussed with Bowie hiring an employee from Wabtec to which Bowie replied, "We don't do that."  Bowie further stated to CW2 that "I'm not taking any of his guys [a reference to the Wabtec President in South Carolina] and he's not taking any of our guys."

12.     Although the DOJ and Defendants have reached a settlement, pursuant to which Defendants have agreed to stop the anticompetitive conduct, the DOJ settlement does not provide relief for those who were injured by Defendants' no-poach conspiracy.  Plaintiff seeks to recover the difference between the compensation that she and Class members were paid and what she and Class members would have been paid absent Defendants *per se* unlawful conduct.  Without

---

[2] The Class Period is defined herein as the period from January 1, 2009 through the present.

this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their collusion.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) as the action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.    Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391(b), (c), and (d) because (1) one or more of the Defendants resided, transacted business, were found, and/or had agents in this District; (2) a substantial part of the events giving rise to Plaintiff's claims arose in the District; and/or (3) a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

15.    Each Defendant is subject to personal jurisdiction in this District because each, directly and/or through its subsidiaries and affiliates:  (1) transacted business throughout the United States, including in this District; (2) had substantial contacts with this District; and/or (3) engaged in an illegal scheme that was, in part, entered into in this District and was directed at or had the intended effect of injuring Plaintiff and Class members, including Class members residing in, located in, or doing business in this District.

## III.    THE PARTIES

16.    Plaintiff Janis McNeal worked for Defendant Knorr Brake from April 2014 to October 2016 and held the position of Document Control Coordinator.  Plaintiff is a resident of York, Pennsylvania.

17.    Defendant Knorr is a privately-owned German company with its headquarters in Munich, Germany.  Knorr is a global leader in the development, manufacture, and sale of rail

and commercial vehicle equipment.  In 2017, Knorr had annual revenues of approximately $7.7 billion.  Knorr holds several wholly-owned subsidiaries in the United States.

18.     Defendant Knorr Brake, a wholly-owned subsidiary of Defendant Knorr, is a Delaware corporation with its headquarters in Westminster, Maryland.  It manufactures train control, braking, and door equipment used on passenger rail vehicles.

19.     Defendant NY Air Brake, a wholly-owned subsidiary of Defendant Knorr, is a Delaware corporation with its headquarters in Watertown, New York.  It manufactures railway air brakes and other rail equipment used on freight trains.

20.     Defendant Bendix Commercial Vehicle Systems LLC ("Bendix"), a wholly-owned subsidiary of Defendant Knorr, is a Delaware corporation with its headquarters in Elyria, Ohio.  It develops and supplies active safety technologies, air brake charging, and control systems and components for medium- and heavy-duty trucks, tractors, trailers, buses, and other commercial vehicles.

21.     Defendant Wabtec is a Delaware corporation headquartered in Wilmerding, Pennsylvania.  With over 100 subsidiaries, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail industry.  Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications.  It is based in Spartanburg, South Carolina.

22.     Defendant Faiveley North America is wholly-owned subsidiary of Wabtec and a New York corporation with its principal place of business located in Greenville, South Carolina. Prior to its acquisition by Wabtec on November 30, 2016, Faiveley North America was a subsidiary of Faiveley, which had been a French société anonyme based in Gennevilliers, France.

Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr.  Faiveley had employees in 24 countries, including at six U.S. locations.  It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016.  In the United States, Faiveley Transport S.A. conducted business primarily through Defendant Faiveley North America.  Certain Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this Complaint.

23.     Defendant Railroad Controls, L.P., a wholly-owned subsidiary of Defendant Wabtec, is based in Benbrook, Texas and is one of the largest railroad signal construction companies in the United States.

24.     Defendant Richard Bowie is the President of Knorr Brake and resides in Westminster, Maryland.

25.     Plaintiff alleges on information and belief that Does 1-20, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.   Does 1-20 are predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials of Defendants.  Plaintiff is presently unaware of the true names and identities of those defendants sued herein as Does 1-20.  Plaintiff will amend this Complaint to allege the true names of the Doe defendants when she is able to ascertain them.

IV.     **THE RAILWAY INDUSTRY LABOR MARKET**

26.     During the Class Period, Defendants and their subsidiaries employed Class members throughout the United States, including in this judicial district.

27.     The anticompetitive conduct engaged in by Defendants and their subsidiaries substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

28.     The U.S. railroad equipment manufacturing industry is highly concentrated, with the 50 largest companies, including Defendants Knorr and Wabtec, accounting for more than 95% of industry revenue. Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

29.     Knorr and Wabtec (which now includes Faiveley) are the world's largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

30.     As of December 31, 2017, Wabtec employed approximately 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.   As of December 31, 2016, Knorr employed approximately 24,500 employees worldwide.

31.     Defendants and their subsidiaries also compete with one another and with firms at other tiers of the rail-equipment industry supply chain to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

32.     There is high demand for and limited supply of employees who have rail-equipment industry experience.  As a result, firms in the rail-equipment industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of other rail-equipment

industry participants, including the employees of each Defendant's customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

33.     Firms in the rail-equipment industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees.  Rail companies also receive direct applications from individuals interested in potential employment opportunities.

34.     Directly soliciting employees from another rail-equipment industry participant is a particularly efficient and effective method of competing for qualified employees.  Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.  Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.  In addition, the rail industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

35.     In a competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs.  This competition benefits employees because it increases the available job opportunities that employees learn about.  Additionally, it improves an employee's ability to negotiate for a better salary and other terms of employment. Defendants' no-poach agreements, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

36.     Directly soliciting employees from another rail equipment industry participant is also an efficient and effective method of competing for qualified employees.  Because such individuals likely already have the specialized skills necessary for the role, a competitor is able to cut costs and avoid risks by poaching employees from its rival.  Indeed, a company is able to take advantage of the competition's work in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on that rival by removing an employee on whom it may depend.  Therefore, if each Defendant was truly acting its own independent self-interest, it would be soliciting other Defendants' employees through, among other things, offers of increased employment benefits and pay—not agreeing to refrain from doing just that.

## V.     DEFENDANTS' NO-POACH CONSPIRACY

37.     Over a period spanning several years, Wabtec, Knorr, and Faiveley entered into no-poach agreements with one another to eliminate competition between them for employees. These agreements were executed and enforced by senior company executives and reached several of the companies' U.S. subsidiaries.  The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

38.     ***Wabtec-Knorr Agreements.***  Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees.  Although these no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles, the agreements applied to all employees and restricted each company from soliciting any current employee from the other's

company.  At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

39.     Beginning no later than 2009, Wabtec's and Knorr Brake's most senior executives, including Defendant Bowie and others, entered into an express no-poach agreement which was actively managed through direct communications.  For example, in a letter dated January 28, 2009, a director of Knorr Brake wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies.  As you so accurately put it, 'we compete in the market.'" Although the no-poach agreement was between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well-known to senior executives at the parent companies, including top Knorr executives in Germany who were included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and Knorr Brake also informed their outside recruiters not to solicit employees from the other company.

40.     In some instances, Wabtec and Knorr Brake's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake without prior approval of the other firm.  For example, in a 2010 internal communication, a senior executive at Knorr Brake stated that he would not even consider a Wabtec candidate who applied to Knorr Brake without the permission of his counterpart at Wabtec.

41.     Wabtec and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses.  In July 2012, for example, a senior executive at NY Air Brake Corporation informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

42.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements.  For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who allegedly solicited a Knorr Brake employee for an opening at Wabtec.  The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

43.     ***Knorr-Faiveley Agreement.***  Beginning no later than 2011, senior executives at Knorr Brake and Faiveley North America reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company.  In October 2011, a senior executive at Knorr Brake explained in an e-mail to a high-level executive at Knorr-Bremse AG that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]"  Executives at Knorr Brake and Faiveley North America actively managed the agreement with each other through direct communications.

44.     In or about 2012, a senior executive at Knorr Brake discussed the companies' no-poach agreement with an executive at Faiveley North America.  This discussion took place at a trade show in Berlin, Germany.

45.     InnoTrans, the world's largest trade fair focused on the rail transport industry, took place at the Messe Berlin exhibit center from September 18 through September 21 in 2012.[3] That event, which has been held every two years since 1996, attracted 126,110 trade visitors from 140 countries with 2,515 companies from 49 countries presenting exhibitions.[4]  Among those listed as exhibitors were Knorr and Faiveley—thus providing Defendants with the opportunity and means by which they could have established and furthered their no-poach conspiracy.

46.     Subsequently, the executives enforced the no-poach agreement with each other through direct communications.  This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure adherence to the agreement.  For example, in October 2012, executives at Faiveley North America stated in an internal communication that they were required to contact Knorr Brake before hiring a U.S. train brake engineer.

47.     The companies continued their no-poach agreement until at least 2015.  After Wabtec announced its proposed acquisition of Faiveley in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other jurisdictions to raid Faiveley for high-potential employees.

48.     ***Wabtec-Faiveley Agreement.***   Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

---

[3]   *InnoTrans 2012 sets new records*, Railway Gazette (Sept. 27, 2012), http://www.railwaygazette.com/news/single-view/view/innotrans-2012-sets-new-records.html (last visited June 6, 2018).

[4] *Id.*

13

49.     Wabtec Passenger Transit and Faiveley North America executives actively managed and enforced their agreement with each other through direct communications.  For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley North America without first getting permission from Faiveley North America executives.  In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley North America]."  Only after receiving permission from Faiveley North America did Wabtec Passenger Transit hire the project manager.  One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley North America's employees was "off the table" due to the agreement with Faiveley North America not to engage in hiring discussions with each other's employees without the other's prior approval.

50.     In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016.  Presently, Faiveley North America is a wholly-owned subsidiary of Wabtec.

## VI.    MULTIPLE FORMER EMPLOYEES AND THIRD-PARTY RECRUITERS INDEPENDENTLY CORROBORATE DEFENDANTS' CONSPIRACY

51.     The above illicit agreements are corroborated by several former employees of the Defendants and by third-party recruiting companies retained by Defendants.

52.     According to CW1, during the Class Period, Defendant Bowie issued a specific directive to CW1 and other Knorr Brake professionals to refrain from recruiting employees from Wabtec or Faiveley North America.  CW1 recalls that Bowie explained that this moratorium was premised upon agreements between Knorr Brake, Wabtec, and Faiveley North America to not poach one another's employees.

53.     CW1, who worked in management for Knorr Brake and had oversight responsibilities related to human resources, further explains that Bowie's statement came during a weekly staff meeting attended by Bowie and various senior staff—including the Director of the HVAC Business Unit, Director of the Service Technicians Unit, Director of the Doors (IFE) Business Unit, Director of the Brakes Business Unit, Director of the Sales and Service (Engineering) Unit, Director of Finance, Director of Business Development, Director of Human Resources, and Vice President of Contracts.  During this particular meeting, CW1 briefed Knorr Brake senior staff on open senior positions.  Thereafter, the Directors of the Service Technician and HVAC Units recommended certain Faiveley employees that may have been viable candidates to fill current vacancies.  At this point, however, Bowie interjected and instructed his team to refrain from recruiting employees from Wabtec and Faiveley North America because Knorr Brake had reached no-poach agreements with those competitors.

54.     CW1 believes that Bowie may have mentioned the no poach agreements at other weekly staff meetings.  CW1 notes that Bowie's directive eliminated the ability of human resources professionals at Knorr Brake and its outside recruiters to "mine" employees from Faiveley North America or Wabtec.

55.     CW2 worked as a Director and was a lead engineer for Knorr Brake during the Class Period and reported directly to Defendant Bowie.  CW2 confirms that although she believes it was not formally documented, there were no-poach agreements between Knorr, Wabtec and Faiveley.  She was told as much by Defendant Bowie.  CW2 recalls that there were instances during the Class Period when she discussed with Bowie hiring an employee from Wabtec to which Bowie replied, "We don't do that."  Bowie further stated to CW2 that "I'm not taking any of his guys [a reference to the Wabtec President in South Carolina] and he's not

taking any of our guys."  CW2 further recalls that the no-poach agreements were also raised in private meetings to discuss hiring practices that were attended by small groups of three or four persons, including the HR Director.  CW2 states that there were communications amongst Defendants at the senior executive level to enforce the no-poach agreements and that Bowie engaged in such communications. Finally, CW2 cannot recall a single Wabtec employee being hired by Knorr Brake during her tenure.

56.     CW3, who worked in human resources for NY Air Brake during the Class Period, notes that Wabtec had a location in close proximity to NY Air Brake's Riverside, Missouri location.  CW3 states the she learned through discussions with human-resources colleagues and a plant manager that she also could not recruit from Wabtec.  Indeed, CW3 explains, the message was clear: do not to actively call current employees from Wabtec to recruit them to work at NY Air Brake.  CW4, another human resources manager from NY Air Brake, confirms that during the Class Period, she also learned verbally about an agreement to refrain from recruiting employees from Wabtec.

57.     CW5, who worked as a Talent Acquisition Recruiter for Defendant Bendix during the Class Period, was directed not to recruit employees from competitor companies.  CW5 further states that she followed that directive.

## VII.  DOJ INVESTIGATES DEFENDANTS' AGREEMENTS TO REFRAIN FROM SOLICITING EACH OTHER'S EMPLOYEES

### A.     DOJ Issues Guidance in 2016 Relating to Employer No-Poach Agreements

58.     Anti-poaching agreements among competitors have always been unlawful under the antitrust laws.  Notwithstanding, in October 2016, DOJ's Antitrust Division and the Federal Trade Commission issued Antitrust Guidance For Human Resource Professionals (the "Guidance").  DOJ issued the Guidance to help HR professionals implement safeguards to

prevent inappropriate discussions or agreements with other firms seeking to hire similar employees.

59.     In the Guidance, DOJ alerted HR professionals and others involved in hiring and compensation decisions that "[a]n agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; term of employment; or even job opportunities."   The Guidance specifically called out the illegality of no-poach agreements:  "An individual likely is breaking the antitrust laws if he or she . . . . agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called 'no poaching' agreements)."

60.     The following month, on November 17, 2016, acting assistant attorney general of DOJ's Antitrust Division, Renata B. Hesse, stated, "[G]oing forward employers who conspire to hold down wages or restrict hiring of each other's workers will be investigated criminally and, if appropriate, prosecuted criminally.  Naked 'no-poaching' agreements or agreements to fix wages stamp out competition just like agreements to allocate customers or to fix product prices, violations of the law that the Division has traditionally investigated criminally and prosecuted as hardcore cartel conduct."

61.     DOJ officials under the current administration have reiterated that they would continue to prosecute naked no-poach agreements. For instance, on September 12, 2017, Principal Deputy Assistant Attorney General Andrew C.  Finch stated that employers "should be on notice that a business across the street from them—or, for that matter, across the country— might not be a competitor in the sale of any product or service, but it might still be a competitor

for certain types of employees such that a naked no-poaching agreement, or wage-fixing agreement, between them would receive per se condemnation."

62.     On January 19, 2018, Makan Delrahim, Assistant Attorney General for DOJ's Antitrust Division, speaking at a conference sponsored by the Antitrust Research Foundation at George Mason University in Virginia, stated that the agency remained "very active" in policing no-poach agreements between employers.

63.     Soon thereafter, on January 23, 2018, Mr. Finch, speaking to the Heritage Foundation, further stated that the "Division will continue to monitor closely . . . the employer-employee relationship and, in particular, what are sometimes called 'employee no-poach' agreements."  He also stated that "the Division expects to initiate multiple no-poach enforcement actions in the coming months."

64.     And, on April 17, 2018, DOJ Deputy Assistant Attorney General Barry Nigro echoed the same at the American Bar Association's Spring Meeting:  "Going forward, we intend to . . . investigate those [no-poach agreements] and, if appropriate, pursue them criminally . . . This is an area that is active [at DOJ] . . . I've personally been surprised at how many of these agreements I've stumbled across . . . many more than I expected . . . including companies whose names you all know . . . There is more activity in this area than you realize."

**B.**     **DOJ Settles Claims with Defendants in 2018 for Misconduct Revolving around their No-Poach Agreements**

65.     Beginning in or around 2016, the Antitrust Division of the United States Department of Justice started an investigation into the employment practices of Defendants.  As a result of its investigation, the DOJ concluded that Defendants had agreed to unreasonable restraints of trade that were *per se* unlawful under the antitrust laws.  Specifically, the DOJ said, the no-poach agreements "were facially anticompetitive because they eliminated a significant

18

form of competition to attract skilled labor in the U.S. rail industry."  The DOJ also stated that "[t]hese agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

66.     On April 3, 2018, the DOJ filed a complaint alleging that Defendants' no-poach conspiracy violated Section 1 of the Sherman Act.  The DOJ also filed a stipulated proposed final judgment in which Wabtec and Knorr agreed that the DOJ's complaint "state[d] a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."

67.     In the stipulated proposed final judgment, Wabtec and Knorr are "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision."  Wabtec and Knorr also agreed to comply with a variety of enforcement measures.

68.     The DOJ has not sought monetary penalties of any kind against Defendants, and has made no effort to compensate individuals who were harmed by the Defendants' conspiracy. Thus, without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

## VIII.   ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

69.     Defendants' no-poach conspiracy substantially reduced competition for labor. Defendants entered into, implemented, and policed these agreements with the knowledge of the overall conspiracy, and did so with the intent and effect of fixing the compensation paid to their personnel at artificially low levels.

70.     Plaintiff and each member of the Class were harmed by every agreement alleged herein.  The elimination of competition and suppression of compensation due to the conspiracy

affected all Class members.  For example, Wabtec personnel received lower compensation as a result of not only Wabtec's illicit agreements with Knorr Brake, but also as a result of Knorr's agreement with Faiveley, and so on.

71.    The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

72.    While the conspiracy constitutes a *per se* violation of the Sherman Act, Defendants exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

73.    Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest—and they possess significant market power.  Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the relevant market.

## IX.    FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

74.    Plaintiff and members of the Class had no knowledge of the combination and/or conspiracy alleged herein, or of facts sufficient to establish constructive knowledge of the claims set forth herein, and could not discover the antitrust violations alleged herein through exercise of reasonable diligence until, at the earliest, April 3, 2018, when the DOJ's settlement with Defendants became public.

75.    Defendants' conspiracy was, by its very nature, secretive and self-concealing. Defendants engaged in a form of market manipulation which could not be detected by Plaintiff

or members of the Class.  Defendants' conspiracy was of a secret nature and Defendants relied

on non-public methods of communication to collude with each other and co-conspirators.  The

secret nature of the conspiracy and Defendants' intentional concealment of the conspiracy

precluded Plaintiff and members of the Class from uncovering Defendants' unlawful conduct

alleged herein.

76.    As a result of the self-concealing nature of Defendants' conduct, as well as

Defendants' fraudulent and affirmative concealment of the alleged combination and/or

conspiracy, Plaintiff and members of the Class could not have discovered the alleged

combination and/or conspiracy at an earlier date through the exercise of reasonable diligence.

77.    As such, the statute of limitations applicable to the claims of Plaintiff and

members of the Class has been tolled with respect to Plaintiff's claims concerning Defendants'

conspiracy.

## X.    CLASS ALLEGATIONS

78.    Plaintiff brings this action on behalf of herself and as a class action under Rules

23(a) and (b) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of

the following class (the "Class"):

> All natural persons employed by Defendants or their wholly owned
> subsidiaries at any time from January 1, 2009 to the present (the
> "Class Period"). Excluded from the class are senior executives and
> personnel in the human resources and recruiting departments of the
> Defendants, and employees hired outside of the United States to
> work outside of the United States.

79.    While Plaintiff does not know the exact number of Class members, Plaintiff

believes that there are at least hundreds of members of the Class described above, making the

Class so numerous and geographically dispersed that joinder of all members of the Class is

impracticable.

80.     There are questions of law and fact common to each member of the Class that relate to the existence of the combination and/or conspiracy alleged herein and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     whether Defendants agreed not to solicit each other's employees;

b.     whether such agreements were *per se* violations of the Sherman Act;

c.     whether Defendants fraudulently concealed their conduct;

d.     whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

e.     whether Plaintiff and the other Class members suffered injury as a result of Defendants' agreements;

f.     whether any such injury constitutes antitrust injury;

g.     the measure of damages suffered by Plaintiff and the Class.

81.     Plaintiff's claims are typical of the claims of the Class.   As alleged herein, Plaintiff and members of the Class each sustained damages arising out of the same course of unlawful conduct by Defendants and their co-conspirators.

82.     Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to, or which conflict with, the interests of the other members of the Class.

83.     Plaintiff's interests are co-extensive with, and not antagonistic to, the interests of the absent Class members.  Plaintiff will undertake to represent and protect the interests of the absent Class members.

84.     Plaintiff has engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent Class members.

85.     Class action status is warranted under Rule 23(b) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI.     CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

86.     Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

87.     During the Class Period, Defendants entered into and engaged in unlawful no-poach agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

88.     Defendants' agreements have included concerted actions and undertakings among themselves with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

89.     Defendants' conspiracy is a *per se* violation of Sections 1 of the Sherman Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

a.    certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

b.    find Defendants' conduct alleged herein violates Section 1 of the Sherman Antitrust Act;

c.    award Plaintiff and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

d.    award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

e.    direct any such further relief that the Court may deem just and proper.

## XIII.   JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  June 6, 2018                          Respectfully submitted,

By:  */s/ Cyril V. Smith*
Cyril V. Smith, Esquire (07332)
Alicia Shelton, Esquire (11538)
**ZUCKERMAN SPAEDER LLP**
100 East Pratt Street
Suite 2440
Baltimore, MD 21202-1031
Telephone:  (410) 332-0444
Facsimile:  (410) 659-0436
csmith@zuckerman.com
ashelton@zuckerman.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer, Esquire
(*pro hac vice* motion forthcoming)
Kimberly A. Justice, Esquire
(*pro hac vice* motion pending)
Zachary Arbitman, Esquire
(*pro hac vice* motion forthcoming)

24

280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
kjustice@ktmc.com
zarbitman@ktmc.com

*Attorneys for Plaintiff and the Class*